UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RUSSELL TINSLEY,** | Civil Action No. 23-734 (MCA) (JBC) |
| **Plaintiff,** | |
| v. | **MEMORANDUM OPINION** |
| **STATE OF NEW JERSEY DEPARTMENT OF HUMAN SERVICES, et al.,** | |
| **Defendants.** | |

This matter comes before the Court on Plaintiff Russell Tinsley's Complaint and his application to proceed *in forma pauperis*. ECF Nos. 1, 1-2. At this time, the Court grants Plaintiff's IFP application. Federal law requires the Court to screen Plaintiff's Complaint for *sua sponte* dismissal prior to service, and to dismiss any claim if that claim fails to state a claim upon which relief may be granted and/or to dismiss any defendant who is immune from suit. *See* 28 U.S.C. § 1915(e)(2)(B); *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). Because Plaintiff is proceeding pro se, the Court construes his allegations liberally. *See Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011). To survive screening, Plaintiff's Complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly* 550 U.S. at 557).

## I. SCREENING OF THE FEDERAL CLAIMS UNDER 1915(E)(2)(B)

Plaintiff is civilly committed as Sexually Violent Predator ("SVP") and resides at the Special Treatment Unit ("STU") in Avenel, New Jersey. He has sued the State of New Jersey, Department of Human Services ("DHS"), Division of Mental Health and Addiction Services, Ann Klein Forensic Center, STU Clinical Director Doreen Stanzione, Clinical Program Coordinator Jacquelyn Ottino, Lauren Toth, Nicole Dorio, Paul Dudek, Charlotte Purunty, Ms. Hallper, Henry Gantt, C/O Williams, C. Raupp, G. Daza, A. Motley, Sandra Connolly, M.D., and Sgt Socolof. He appears to bring claims under 42 U.S.C. § 1983 and under state law. Plaintiff has also supplemented his Complaint multiple times, ECF No. 5-7, 9-11, and submitted a motion for pro bono counsel. ECF No. 8. The Court first considers the federal claims, which Plaintiff brings pursuant to 42 U.S.C. § 1983.

### a. Personhood Requirement under 42 U.S.C. § 1983

To succeed on a claim under § 1983, a plaintiff must show: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federally secured right. *See, e.g., Moore v. Tartler*, 986 F. 2d 682, 685 (3d Cir. 1983). Neither a State nor its officials acting in their official capacities are "persons" under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). From the outset, the Court dismisses the § 1983 claims against the State of New Jersey, DHS, Division of Mental Health and Addiction Services, Ann Klein Forensic Center, as well as the § 1983 damages claims against the individual Defendants in their official capacities.

### b. Claims Related to the Failure to Advance Plaintiff in Treatment

Plaintiff's allegations about the individual Defendants and his counts for relief are circuitous, disjointed, and lack necessary context, but the Court nevertheless attempts to liberally

construe these claims. The gravamen of Plaintiff's Complaint appears to be that Defendants are not advancing him in treatment due to 1) his filing of complaints and lawsuits, 2) his self-representation in his civil commitment proceedings, and 3) racial bias against him. *See* Complaint at 2. Plaintiff generally alleges that Defendants have retaliated, "racially targeted," and "discriminated against" him by failing to advance him to Phases 3, 4, and 5 and failing to discharge him from the STU. *Id.*

To provide context for Plaintiff's allegations, the Court summarizes the available record from his commitment review hearing, which was conducted by Judge Bradford M. Bury.[1] *See Matter of Commitment of R.T.*, No. A-1887-21, 2023 WL 8016717 (N.J. Super. App. Div. Nov. 20, 2023). As explained by the Appellate Division:

> [T]he present review hearing was conducted by Judge Bradford M. Bury over the course of seven non-consecutive days between September 15, 2021, and January 25, 2022. The State presented the expert testimony of psychiatrist Dr. Nicole Dorio, D.O., and psychologist Dr. Paul Dudek, Ph.D., a member of the STU's Treatment Progress Review Committee (TPRC). R.T. represented himself at the hearing with the assistance of standby counsel. R.T. did not testify but called his own expert in psychology, Dr. Ronald Silikovitz, Ph.D., and the STU's medical director, Dr. Sandra Connolly, who testified as a fact witness. The judge also considered the "plethora of documents admitted into evidence" by both parties, including the experts' reports, the STU's treatment records, and R.T.'s self-published book.

Although Judge Bury credited much of Dudek and Dorio's testimony and their ultimate conclusions that Plaintiff should remain civilly committed, he noted that he "did not find [Dr. Dorio] credible in certain areas with regard to giving [R.T.] his due, and his appropriate credit" *Id.*

---

[1] Judge Bury, now retired, is interviewed in one of the news articles submitted by Plaintiff. *See* ECF No. 9. Judge Bury discusses problems with the way New Jersey's civil commitment program is administered and expresses his view that up to 1/3 of detainees at the STU could be released safely. *See id.* The Court notes, however, that Judge Bury determined in Plaintiff's case that he should remain civilly committed with an expedited review period.

at *2.  Judge Bury also determined that Plaintiff's expert opinion from Dr. Silikovitz "has to be rejected wholesale because he doesn't address . . . the core requirement[ ] under the statute" of whether the individual has mental abnormality or personality disorders."  *Id.*  Judge Bury ultimately determined that Plaintiff's commitment should continue, finding:

> "clear and convincing evidence that [R.T.] suffers from a mental abnormality or personality disorder that affects him emotionally, cognitively, or volitionally to such a degree that he is predisposed to commit acts of sexual violence."  Further, "[i]f released, [R.T.] would have serious difficulty controlling his sexually violent behavior to such a degree that he will be highly likely within the reasonably foreseeable future to engage in acts of sexual violence."

*Id.* at *3.  Judge Bury also "recognized R.T. was 'promoted to Phase 2' after he was removed from treatment refusal status. In view of R.T.'s progress, the judge 'order[ed] that by the next expedited review hearing date, so long as he continues to . . . meaningfully engage in treatment, he shall move to Phase 3A.'"  *Id.*  Judge Bury "issued a memorializing order continuing R.T.'s commitment and scheduling the next review hearing on September 7, 2022."  *Id.*

In his Complaint, Plaintiff alleges that Defendants are subject to a court order dated February 9, 2022, which required Plaintiff to be promoted from Phase 2 to Phase 3A at his next review hearing on September 7, 2022, as long as Plaintiff continued to exercise good faith and due diligence in his treatment.  *See* Complaint at 2, 5.  According to Plaintiff, his "treatment team, TPRC, Dr. Dorio and Dr. Dudek "failed to credit" Plaintiff for his progress he made and completed in treatment and the Court ordered an "accelerated review" of Plaintiff's progress.[2]  *Id.* at 5.

---

[2] According to the Complaint, Judge Bury also allegedly made findings about Dr. Main, the former Clinical Director of the STU, and how Main allegedly "had it in for" Plaintiff due to his filing of grievances and lawsuits.  Main allegedly told Plaintiff he would never get out of the STU if he kept filing grievances, and these allegations were the subject of a prior civil rights case in the District Court.  *Id.* at 6.

In his Complaint, Plaintiff does not explicitly allege that Defendants refused to advance him from Phase 2 to Phase 3A. But Plaintiff alleges that on September 7, 2022, Defendant Dudek issued a report that included misrepresentations and did "not honestly reflect the truth from Plaintiff's interview" or his treatment progress. Complaint at 3. Plaintiff alleges the report was based on "bias and prejudice," breached the court order, violated the code of ethics for psychologists and amounted to malpractice. *Id.* Plaintiff, however, provides no examples or facts showing bias or misrepresentations in Dudek's report.

According to the Complaint, on October 9, 2022, Plaintiff allegedly filed "many" grievances against Defendants regarding "the full range of conditions at the STU that involved Plaintiff" and against Defendants Stanzione, Ottino, Toth, Dorio, Dudek, Prunty, Hallper, Ganft, Sgt. Socolof, Officer Williams, H. Gantt, C. Raupp, A. Motleys, and Sandra Connolly, M.D. *Id.* Plaintiff also filed grievances about his treatment team, the TPRC and Dudek and Dorio's reports, complaining that they were untruthful due to alleged racial bias and prejudice toward Plaintiff. *Id.* at 3-4. In one of the grievances he submitted on October 9, 2022, Plaintiff also requested a treatment team meeting with his own family members and a standby attorney to discuss his treatment issues and punishment he has received. *Id.* at 5. On November 17, 2022, Defendant Stanzione, Treatment Team 3, or Ottino denied the grievance. *Id.* Plaintiff also alleges that he filed claims and informed Defendants Stanzione, Ottino, Toth, Dorio, and Dudek about "all of the misconduct" described in his complaint. Plaintiff also notified the Ombudsman about certain complaints. *Id.* at 13-14.

Plaintiff also alleges that on December 12, 2022, Defendant Toth gave Plaintiff a copy of a report prepared by Defendant Dudek, which included findings from the TPRC and Treatment Team 3 recommendations. *See* Complaint at 2. Plaintiff further alleges that Toth's treatment notes,

which she sent to the TPRC committee, do not truthfully reflect Plaintiff's positive progress and his meaningful discussion of his sex offense history and are based on racism. *Id.* at 2, 4. Plaintiff provides no additional facts of examples of misrepresentations or racism allegedly contained in Toth's treatment notes.

Defendant Toth also allegedly facilitated Plaintiff's Process Group 13 and asked Plaintiff about "How was Court and what happened," and Plaintiff discussed the Judge Bury's Order and its findings. *Id.* at 5. In his progress group, Plaintiff also allegedly discussed Dudek's report and pointed out to the group that the report is dishonest about his interview and treatment progress and is based on Toth's treatment notes, which include "racial profiling," and "lies, bias[,] and prejudice." *Id.* Although Defendant Toth allegedly knew Dudek's report was wrong, she supported Dudek's fabricated report. *Id.* at 6-7. Again, Plaintiff does not provide any facts about the "dishonest" or "fabricated" portions of Dudek's reports or provide facts showing that Toth's treatment notes were based on "racial profiling" or racial bias.

In his Complaint, however, Plaintiff repeatedly draws an analogy between his confinement in the STU and slavery. According to Plaintiff, Defendants are treating Plaintiff and other STU residents "like Africans w[ere] treated on the planation" during slavery and like black South Africans were treated during apartheid. *Id.* at 4. He also alleges that he told the process group and Defendant Toth that Dudek were taking his freedom and responsibility away like African Americans had their freedom taken during the time of slavery. *Id.* at 7. Later in the Complaint, Plaintiff alleges that Defendant Toth threatened Plaintiff with MAP placement and "was a hostile racist herself to Plaintiff, and engaged in Racism Discrimination" and abuse to sabotage Plaintiff's

progress.³  *Id.* at 11-12.  Plaintiff also alleges that on June 22, 2022, Toth "forced Plaintiff to ignore his complaints" about white residents who called him a "Nigger[.]"  *Id.* at 12.  He does not elaborate or provide any context for this incident.

Plaintiff also alleges that black STU residents have been murdered as a result of "systemic racism."  *Id.* at 8-9.  Plaintiff further alleges that two black residents were murdered by corrections officers, both in 2019, and nothing was done by the State of New Jersey, DHS, or Stanzione.  *Id.* at 9.  Plaintiff also alleges that black men are overrepresented among those who are civilly committed.  *Id.* at 11.  He further alleges that he has been a "victim" of Defendants' racism and discrimination throughout 2020, but provides no facts to support this allegation.  *Id.*

Plaintiff also alleges without factual support that Stanzione, Ottino, Toth, Dorio, and Dudek have "used their knowledge of Plaintiff's abuse as a tool during Plaintiff's individual interviews and group therapy sessions against him."  *Id.* at 15-16.

Plaintiff further alleges that Defendant Dorio told Plaintiff that "all of [P]laintiff's civil rights were taken from him, and especially regarding his religious faith and belief as a protective factor against sexual abuse."  *Id.* at 16.  Defendant Toth allegedly told Plaintiff that "religion do[es] not have anything to do with treatment."  *Id.*

Plaintiff also contends that due to his "multiple complaints," he has been a target for harassment, physical abuse from other residents, correctional officers, and treatment facilitators at the STU.  For example, Plaintiff alleges he has been denied credit for his treatment work, punched

---

³ Later in the Complaint, Plaintiff also alleges that after he filed grievances about not getting treatment credits, he was threatened with "MAP lock up time" if he complained about civil commitment abuse, but he does not identify who threatened him.  *Id.* at 13.

in the eye by residents, and threatened with his life and safety by unidentified corrections officers. *Id.*

In Count I, Plaintiff brings a claim under the Fourteenth Amendment for denying him adequate treatment. *Id.* at 9. Plaintiff may be asserting that Defendants have violated his fundamental right to minimally adequate treatment as a civilly committed sex offender, which arises under the Fourteenth Amendment. In *Learner v. Fauver*, 288 F.3d 532 (3d Cir. 2002), the Third Circuit held that, since New Jersey's statutory scheme for sex offenders is predicated on the inmate's response to treatment, that statutory regime creates a fundamental due process liberty interest in treatment. *Id.* at 545; *See also Youngberg v. Romeo*, 457 U.S. 302, 316, 319, 322 (1982); *Kansas v. Hendricks*, 521 U.S. 346, 368–69 (1997) (inmates housed in prison-like conditions must be afforded a treatment comparable to that provided to other civilly committed persons confined in treatment units). Thus, under Third Circuit law, Plaintiff has a substantive due process right in a treatment facilitating his release prospects, and "New Jersey's statutory scheme for the civil commitment and treatment of sex offenders creates a due process liberty interest in that treatment." *Tinsley v. Main*, No. 20-2846, 2021 WL 2853152, at *2 (Jul. 8, 2021) (citing *Leamer*, 288 F.3d at 545). In assessing this type of claim, courts ask whether the "officials acted with deliberate indifference with respect to the Plaintiff's treatment and deprived him of his liberty interest in a way that shocks the conscience." *Id.* (citing *Leamer*, 288 F. 3d at 546-47).

Here, Plaintiff does not complain that he is not receiving sex offender treatment; rather, he alleges that Stanzione, Ottino, Toth, and Dorio, and Dudek are not advancing him to the next phase of treatment and preventing his release due to their "web of lies, deception, and misinformation." *Id.* at 10. The Court assumes without deciding that Plaintiff could state a Fourteenth Amendment due process claim if Defendants' wrongfully refused to advance him to the next phase of treatment

despite him completion of all the requirements. Plaintiff, however, does not provide sufficient well-pleaded facts to support his largely conclusory claims that Defendants lied about his progress or that their reports were based on lies, racism, or retaliation. As such, Plaintiff has not pleaded sufficient facts showing that Defendant's conduct in failing to advance him in treatment shocks the conscience. The Court dismisses the due process claim without prejudice and provides Plaintiff with leave to amend.

The Court also construes Plaintiff to raise a First Amendment Retaliation claim against the same Defendants because they are allegedly failing to advance him in treatment due to his filing of grievances and lawsuits and because he is representing himself in his civil commitment proceedings. To state a First Amendment retaliation claim, a prisoner plaintiff must allege (1) "that the conduct which led to the alleged retaliation was constitutionally protected"; (2) "that he suffered some 'adverse action' at the hands of the prison officials"; and (3) "a causal link between the exercise of his constitutional rights and the adverse action taken against him," or more specifically, "that his constitutionally protected conduct was 'a substantial or motivating factor' in the decision" to take that action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). A causal connection may be shown through "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). Moreover, where an SVP alleges that his grievances played a role in an evaluator's decision not to advance him in treatment, the plaintiff must allege facts showing that "it is his protected activity itself, not just the medically relevant collateral consequences of that activity," that played a role in the Defendants' recommendation not to advance him. *See Oliver v. Roquet*, 858 F.3d 180, 193 (3d Cir. 2017).

Here, Plaintiff alleges that Defendant Dudek issued his misleading report in September 2022, and Plaintiff filed many grievances, including a grievances about the TPRC, Dudek, and Dorio's reports, in October 2022. Plaintiff then received a copy of Dudek's report from Defendant Toth in December 2022. It is unclear whether and when Defendants decided not to advance Plaintiff from Phase 2A to 3. The chronology suggests that Plaintiff grieved Defendants' reports or their decision not to advance him to the next stage of treatment, which would not suggest a causal connection between his protected speech and the adverse action. Plaintiff also alleges that he spoke out about the Court's Order and Dudek's report in his process group with Toth, but it is likewise unclear when this speech occurred and whether his speech was a motivating factor in the decision not to advance him to the next phase of treatment. Because Plaintiff fails to allege sufficient facts showing a causal connection between his protected speech (or self-representation) and the adverse action, the Court dismisses without prejudice the treatment-related First Amendment retaliation claims for failure to state a claim for relief and provides Plaintiff with leave to submit an amended complaint.

The Court also construes Plaintiff to bring an equal protection claim under the Fourteenth Amendment challenging discrimination on the basis of race. "To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010). "Claims under § 1983 alleging an Equal Protection violation require proof of 'purposeful discrimination' or 'different treatment from that received by other individuals similarly situated.'" *Road-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 359 (3d Cir. 2024) (quoting S*human ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005)).

Here, Plaintiff baldly alleges that Dudek's report and Toth's notes were racist or racially biased, but he does not support this bare allegation with any well-pleaded facts, i.e., concrete examples or facts showing purposeful race-based discrimination. Nor does Plaintiff plead sufficient facts to show that he has been treated differently from similarly situated SVPs. Plaintiff alleges in a confusing manner that Toth "forced Plaintiff to ignore his complaints" about white residents calling him a "Nigger," but Plaintiff does not include any additional facts or context about Toth's conduct. As a result, the Court is unable to determine whether she engaged in purposeful discrimination or treated him differently from other similarly situated SVPs based on his race.

Nor does Plaintiff raise an equal protection challenge to any SVP policy that impermissibly uses racial classification. *See e.g., Johnson v. California*, 543 U.S. 499 (2005) (requiring strict scrutiny of such policies in the prison context). Instead, Plaintiff repeatedly analogizes civil commitment at the STU to slavery and states that he is subjected to systemic racism, including the fact that black men are allegedly civilly committed at the STU at higher rates than other races.[4] Analogies between slavery and the STU and allegations of systemic racism at the STU, standing alone, do not amount to purposeful discrimination or show that Plaintiff is being treated differently from other similarly situated individuals.[5]

---

[4] The Oxford English Dictionary defines systemic racism as: "Discrimination or unequal treatment on the basis of membership in a particular ethnic group (typically one that is a minority or marginalized), arising from systems, structures, or expectations that have become established within society or an institution." *See* https://www.oed.com/dictionary/systemic-racism_n?tab=meaning_and_use#1314151690100, last visited February 18, 2025.

[5] Plaintiff also alleges that he presented a proposal entitled "Post-Traumatic Slave Syndrome" on or about July 12, 2020, to Defendant Stanzione. *Id.* at 14. Plaintiff alleges that there is a need for the STU's treatment process groups to discuss and examine the pain endured by Black people due to systemic racism through a 10-week class focused on the Black American experience. *Id.* at 14-15. Plaintiff also allegedly encouraged Defendants to alleviate the problem of systemic racism in the STU treatment program and staff and reeducate staff in the "Post-Traumatic Slave Syndrome" to make them more qualified to treat Black men. *Id.* It's unclear how these facts relate to Plaintiff's claims for relief.

For all these reasons, the Court dismisses Plaintiff's equal protection claims for failure to state a claim for relief and provides Plaintiff with leave to amend.

Finally, with respect to his treatment, Plaintiff alleges that Defendant Doria told him told him that "all of [P]laintiff's civil rights were taken from him, and especially regarding his religious faith and belief as a protective factor against sexual abuse." Complaint at 16. Toth also allegedly told Plaintiff that his treatment has nothing to do with religion. *Id.* Although Plaintiff's allegations lack context, he may be trying to allege a claim under the Free Exercise Clause. A prison regulation that substantially burdens religious exercise must be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Plaintiff's allegations, without more, do not state a claim for relief under § 1983 because Plaintiff has not provided sufficient facts showing that Doria, Toth, or any other Defendants have substantially burdened his religious exercise. Indeed, Plaintiff does not allege that he is unable to practice any of his sincerely-held religious beliefs. Because Plaintiff fails to state a claim for relief under the Free Exercise Clause, the Court dismisses this claim without prejudice and provides Plaintiff with leave to amend.

### c. Claims of Sexual Assault

In his Complaint, Plaintiff also attempts to allege several alleged instances of sexual assault. First, he describes an incident of "gross negligence" that occurred on September 18, 2018, by Ottino, the State of New Jersey, DHS—Division of Mental Health and Addiction Services. Complaint at 7. Plaintiff alleges he was "physically and sexually assaulted by a white racist abuse resident" and sought the assistant of Ottino to file criminal charges, and also sought to bring charges of gross negligence against the State of New Jersey, Stanzione, Ottino, Dorio, and Dudek for creating a hostile treatment environment and for illegally confining him. *Id.* at 8. Plaintiff apparently filed a complaint in Woodbridge Municipal Court against his assailant. *Id.* Plaintiff

filed his initial Complaint in this action on or about February 7, 2022, more than two years after the sexual assault on September 18, 2018.  *See Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (§ 1983 claim arising in New Jersey subject to two-year statute of limitations).  Any civil rights (or tort) claims arising from this incident are time barred under the two-year limitations period, and the Court dismisses the § 1983 claims without prejudice on that basis.

In Count I, Plaintiff also alleges that other residents have been sexually assaulted and that Stanzione, Ottino, and others failed to respond to this abuse.  *Id.* at 9-10.  Because Plaintiff does not have standing to bring claims on behalf of other inmates, his claim about the sexual assault of other residents is dismissed with prejudice on that basis.[6]  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) (a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

In Count III, Plaintiff alleges that he reported two incidents of sexual assault by two non-party corrections officers on March 7, 2021.  *Id.* at 12-13.  Plaintiff alleges that sometime after he reported the assaults, he was the victim of being "physically and sexually assaulted" by Defendant CO Williams and was also subjected to threats by him.  *Id.* at 13.  Plaintiff provides no additional facts about the alleged sexual assault by CO Williams, but he contends that CO Williams has also called him names such as "his bitch, faggot, [and] nigger." *Id.* CO Williams also allegedly stated that Plaintiff was his and his white partner's "slave" and they were his "master[s]." *Id.*  Plaintiff

---

[6] Although Plaintiff could rely on other instances of sexual assault at the STU to make out a failure to protect claim, the Court does not construe him to raise this type of claim.  A Fourteenth Amendment deliberate indifference claim for failure to protect has three components: "an inmate must plead facts that show (1) [s]he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to h[er] health and safety, and (3) the official's deliberate indifference caused h[er] harm." *Shorter v. United States*, 12 F.4th 366, 374 (2021) (citing *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012)).  Plaintiff has not attempted to plead facts showing that SVPs in general face a substantial risk of sexual assault from other SVPs, or that any Defendants were deliberately indifferent to that risk.

heard CO Williams tell other residents and staff members that he was hoping that Plaintiff would get angry so Plaintiff would be locked up on the South Unit in MAP or solitary confinement. *Id.*

Plaintiff undoubtedly has a Fourteenth Amendment right "not be sexually assaulted by a state employee while in confinement." *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (immigration detainee who alleged that corrections officer had sexual intercourse with her on several occasions stated a claim for relief). To state a claim for relief, he must do more than recite the bare elements of that claim. Here, Plaintiff states in a formulaic fashion that he was sexually and physically assaulted by CO Williams, and he does not provide any well-pleaded facts about this alleged assault. Under *Iqbal*, 556 U.S. at 678, Plaintiff's allegations merely recite the elements of a sexual assault (or excessive force) claim and thus fail to state a claim for relief. And although Plaintiff also alleges that Williams used verbal slurs against him and hoped that Plaintiff would be disciplined if he reacted to the taunts, "[v]erbal harassment of a prisoner, without more" does not violate the Constitution. *See Richardson v. Sherrer*, 344 F. Appx. 755, 757 (3d Cir. 2009) (considering Eighth Amendment claim based on verbal harassment). To the extent Plaintiff contends that CO Williams assaulted him in retaliation for Plaintiff's reporting of other assaults, he has not pleaded sufficient facts to suggest a causal connection between the two events. The Court dismisses without prejudice the claims for sexual assault, excessive force, verbal harassment, and First Amendment retaliation against CO Williams for failure to state a claim for relief and provides Plaintiff with leave to amend.

### d. Denial of Law Library Access & Access to the Courts

In Count II,[7] Plaintiff also alleges that the actions of Defendants Stanzione, Toth, Ottino, Prunty, and Hallper, resulted in denial of Plaintiff's access to the law library, his inability to use the law library printer, and computers. *Id.* at 12. Plaintiff appears to allege that these Defendants engaged in retaliation by denying him law library access and use of the printer and computers. *Id.* Plaintiff also alleges that he has been representing himself pro se in a civil commitment proceeding pending on appeal before the Superior Court of New Jersey and is also representing himself in an appeal of a habeas case in the United States District Court for the District of New Jersey. He contends he requires reasonable access to the law library, computer, and printer, but he is being ignored and denied access. *Id.* at 16-17. According to Plaintiff, he should have been provided access to the law library for 15-20 hours a week, but this request has been denied, even though the state court ordered that he be provided daily access to the law library, computer and printer. *Id.* at 17. Plaintiff contends that Defendants have violated his right to unlimited access to the law library, computer, and printer in violation of his constitutional rights. *Id.*

Although denial of access to the law library could be an adverse action, Plaintiff has not pleaded sufficient facts to support the remaining elements of a retaliation claim. The First Amendment retaliation claim premised on the denial of law library access and use of the computer and printer is also dismissed for failure to state a claim for relief and the Court provides Plaintiff with leave to amend.

The Court also construes Plaintiff to raise a claim for denial of access to the Courts. As a civil detainee, Plaintiff maintains a "fundamental constitutional right of access to the courts,"

---

[7] In Count II, Plaintiff brings claims under the First, Fourth, Eighth, and Fourteenth Amendments. *Id.* at 10-11. The Court dismisses the Fourth and Eighth Amendment claims, which are inapplicable to Plaintiff, as he is a civilly committed individual.

embodied in the First and Fourteenth Amendments. *Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). There are two general types of access to the courts claims. Forward-looking claims involve official action that "frustrates a plaintiff . . . in preparing and filing suits at the present time." *Christopher v. Harbury*, 536 U.S. 403] at 413, 122 S. Ct. at 2185 (2002). In a forward-looking claim, "[t]he opportunity has not been lost for all time, however, but only in the short term, and the object of this type of suit is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* at 413 (cleaned up). In backward-looking claims, the official acts "allegedly have caused the loss or inadequate settlement of a meritorious case" or the loss of a particular type of relief. *Id.* at 414.

In both types of cases, however, the plaintiff must identify a "nonfrivolous" or "arguable" underlying claim. *See id.* at 415. Indeed, "the underlying cause of action, whether anticipated or lost, is an element [of an access to the courts claim] that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.* This is so because "a prisoner making an access-to-the-courts claim is required to show that the denial of access caused actual injury." *Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir. 2014) (per curiam) (quoting *Lewis v. Casey*, 518 U.S. at 350). That is, a prisoner claiming that he was denied access to the courts must allege an injury traceable to the conditions of which he complains. *Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (per curiam) (affirming dismissal of denial of access claims where plaintiff failed to tie alleged deficiencies in library to harm in underlying action). As relevant here, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance" and, therefore, "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis*, 518 U.S. at 351.

Plaintiff appears to allege that he needs law library access in connection with his civil commitment review proceedings and his federal habeas case. He does not allege any actual injury by providing facts about the underlying claim(s) for relief that have been frustrated or lost due to his lack of library, computer, and printer access. Because Plaintiff has not alleged an actual injury, the Court dismisses without prejudice his access to the courts claim for failure to state a claim for relief and provides him with leave to amend.

    e. **Allegations Regarding Toxic Food and Water & the Denial of "Superfood" Packages**

Plaintiff generally alleges that personnel at the State of New Jersey and the DHS have ignored "dangerous complaints" after having "contemporaneous knowledge of the events at issue with constitutional violations." *Id.* at 4. Plaintiff also alleges generally that employees at the STU "provide no humane conditions of confinement," to ensure that "[P]laintiff and other residents of the STU receive adequate treatment, food, water, clothing, shelter, and medical care." *Id.* at 5. Plaintiff also alleges in passing that the food and drinking water at the STU are "exposed to toxic contamination," leading to illness, cancer, and other diseases. *Id.* at 9. Plaintiff also alleges that the food at the STU is unhealthy and is causing residents to become sick and could cause them to die. *Id.*

According to Plaintiff, the Defendants are not doing enough to ensure that Plaintiff receives adequate food and medical care, and he specifically challenges the alleged denial of "Superfood" packages. According to Plaintiff, Defendant Dr. Sandra Connolly placed Plaintiff on a diabetic diet and recommended that he order "clean Nutrition Superfood packages" due to his medical conditions and weight loss. *Id.* at 19. The mailroom officers, Defendant Sgt. Socolof, and Defendant Dr. Connolly have allegedly withheld Plaintiff's "clean Nutrition Health 'Superfood'

packages" and told Plaintiff he has to order them though the medical department. *Id.* at 18-19. Plaintiff also alleges that Socolof "mistakenly" withheld his Superfood packages. *Id.* at 19.

To the extent Plaintiff alleges the was denied adequate or diet-appropriate food, he fails to state a claim for relief. First, his allegations that the food and water at the STU are toxic is too conclusory to state a claim for relief and he fails to provide any supporting factual allegations for this claim. And, even assuming his Superfood packages were medically prescribed and withheld by Sgt. Socolof, Plaintiff admits that Socolof and Dr. Connolly told him he had to order the supplement though the medical department. He does not provide any facts to suggest that he could not order the Superfood supplement through the medical department as instructed. Moreover, Plaintiff also states the packages were "mistakenly withheld" and he does not allege that he was repeatedly denied medically necessary meals without a legitimate reason. For these reasons, the Court dismisses this claim without prejudice for failure to state a claim for relief and provides Plaintiff with leave to amend.

**II.     The State Law Claims**

Because the Court has dismissed the federal claims, it next addresses whether to assert supplemental jurisdiction over the remaining state law claims. Where a federal court has original jurisdiction over certain claims, it also has supplemental jurisdiction over all other related claims that form part of the "same case or controversy" under Article III of the United States Constitution. 28 U.S.C. § 1367(a); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966) (same). Title 28 U.S.C. § 1367(c)(3) provides that district courts "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." *See also Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) (same). As relevant here, "where the claim over which the district court has original jurisdiction is dismissed before

trial, the district court <u>must</u> decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original). "Additionally, the federal court should be guided by the goal of avoiding needless decisions of state law . . . both as a matter of comity and to promote justice between the parties." *Gibbs*, 383 U.S. at 726. Here, the Court has dismissed the federal claims at an early stage and declines supplemental jurisdiction over any potential state law claims at this time.[8]

### III. CONCLUSION

For the reasons explained in this Memorandum Opinion, the Court dismisses the federal claims brought pursuant to 42 U.S.C. § 1983 pursuant to its screening authority under § 1915(e)(2)(B). The Court declines supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) at this time. The Court also directs the Clerk of the Court to terminate the motion for pro bono counsel pending at ECF No. 8 in light of the dismissal of the federal claims. Plaintiff may submit an Amended Complaint within 45 days, as to those claims the Court has dismissed without prejudice. If Plaintiff does not submit an Amended Complaint within 45 days, the dismissal of the federal claims shall automatically convert to a dismissal with prejudice. An appropriate Order follows.

2/25/25

_____
Hon. Madeline Cox Arleo
United States District Judge

---

[8] If Plaintiff submits an amended complaint, he is free to reassert his state law claims. If Plaintiff states one or more federal claims, the Court will address the state law claims at that time.